Good morning. You may proceed. Thank you, Your Honor. I'm going to attempt to reserve five minutes for rebuttal. All right. Watch the clock there, if you would. Thank you. As everyone knows, this is a case involving a long-term disability policy under the Employee Retirement and Income Security Act. This act provides that the insurance company will have claim determination on an arbitrary and capricious standard of review unless the claimant shows that there's a conflict of interest, in which case that changes. In this case, we believe that conflict of interest was shown. Well, how does it change? Say that again? How does it change? The decision is reviewed with more skepticism. Right. But it's still for an abuse of discretion. No, it could be less than. It could actually go all the way down to a de novo review. And this case was remanded in order to look at that issue? This case was remanded in order to look at that issue. That's correct. Pursuant to a body. There's no question that the company that determined the claim is also the payor of the claimant, that there's an inherent conflict of interest. The claimant generally will need to show more to move that burden of proof in a downward spiral. The case was dismissed on a motion for summary judgment. Now, on a summary judgment motion, that conflict interest, that conflict issue must be viewed in the light most favorable to Ms. Passione in this case, the non-moving party. Let me ask you this. The district court looked at the extra, the outside, the administrative record evidence, which was primarily of Unum's history and the scandal associated with Unum's aggressive claims management practice. And the district court said, well, it didn't say this, but reading it in, even assuming that's all true, which would be the summary judgment standard, even assuming that's all true, the types of practices that were characterized in this extra administrative record evidence wasn't applicable here. Those sorts of procedural practices weren't seen here. So what was wrong with that determination? Well, first, let's talk with the independent medical examination. In that action, subject to the settlement agreement, one of the issues that they found was that there were improper independent medical exam reviews. In this case, they sent the review to Dr. Layden. And the strongest evidence here is his deposition transcript. If you take a look at it, he basically admits that he didn't have all the records. He did not check or perform a thorough examination. He didn't look for fibromyalgia. Hold on a second. Where does he admit, I didn't make a thorough examination? Well, he says he did not check for fibromyalgia tender points. And one of her impairments is fibromyalgia. He never said, I didn't make a thorough examination. He does not use that word. He does not use those words. But he admits that on fibromyalgia, you palpate tender points. That's how you diagnose it. That's how you look for it. And he didn't do that in this case. Also, my client had tenosynovitis. Does he explain why? No. Well, he says he doesn't believe in fibromyalgia. He says he doesn't think tender points is diagnostic of fibromyalgia, which all the medical literature He would say he made a thorough examination. He simply excluded areas of inquiry that he didn't think were relevant. I guess that's what he would say, yes. Except it depends on what you call a thorough examination. He admits that he didn't have all the medical records. He admits that based on the records he did review, he knew he didn't have all the medical records. He says he contacted Unum to find out where those missing medical records were, and they ignored his response. Then he goes on to say, it doesn't really matter because medical records aren't relevant to me. I'm basing my opinion solely on my physical examination. What did Dr. Korczak do then? I would like to talk about Dr. Korczak because his first report says, I don't know, we need to send him out for an examination. But then Korczak comes back after the evaluation with Dr. Layden, and he really doesn't say much about it. If you take a look at that What does he say? What Dr. Korczak, he signs a piece of paper prepared by a nurse practitioner. The nurse practitioner says, I discussed the file with Dr. Korczak, who replies that the IME was thorough and informative, objective and definitive, and agrees with restrictions. Dr. Korczak doesn't, we don't have anything from him saying that's what I said. Isn't that her reporting what he said? The nurse practitioner drew up a synopsis That says what Dr. Korczak said. Okay. If you take a look at 387, what the nurse practitioner did is she writes down the clinical findings that Dr. Layden found, and it's just a synopsis of it. It's six pages long. And then under the conclusion, she says she reviewed it. Now, I don't know if that nurse practitioner prepared this and then walked in and talked to Dr. Korczak with it. No one knows if Dr. Korczak reviewed any medical records. If you look at this synopsis, there's not one mention of a treating physician, an MRI. Did you ever take a deposition of Dr. Korczak? I couldn't. I would have if I could have. But Dr. Korczak, if you look at his report, basically says, I agree with Dr. Layden. So Does this go to the merits, though, of whether the decision maker abused its discretion rather than to the level of skepticism that should infuse the abuse of discretion review in the first place? This goes to the conflict of interest issue because the Explain how that is. The ERISA statute says that there must be a full and thorough review. It must be independent. It must be impartial. The evaluator is a trustee. So your argument is that based on these deficits, as you see it in Dr. Layden's examination, that that's evidence of bias or conflict of interest? Explain how you draw that line. Okay. The claim examiner in this case did not give a complete copy of the medical records to their independent medical examination. That's evidence of a conflict. Then they sent it to a doctor who does not believe in fibromyalgia, says that he's never found anyone with fibromyalgia disabled, says fibromyalgia can never be disabled. When it's absolutely against medical literature and it's a conflict of interest to send a file to a doctor who is not following the rheumatological designations and well-accepted medical rules. Could I ask about the timing of this? Because one of your complaints is that you didn't get discovery on the second go-round. And would that have been discovery that related to the structural conflict? Yes. The discovery related to structural conflict. So why wouldn't that discovery have been just as applicable before a body? There might have been different standards, but the whole issue of conflict was still on the table in these kind of cases. Atwood didn't take that away. Well, prior to a body, discovery was extremely limited in an ERISA claim. First you had to come up with smoking gun evidence. And then it was very tight on what you were able to look at. And the case law denying discovery, there was a plethora of cases at that point in time. Did you seek discovery? I sought discovery. And was denied before a body came back down? No. What happened was, based on the case law That's what I'm just trying to understand. You didn't actually, on round one, seek discovery to take these depositions in order to prove a conflict? Yes. What happened on round one was I served discovery demands. And based on the cases pre-a body, the party stipulated as to what discovery I was entitled to. And we stipulated that I could get the deposition of the vocational consultant, of the two claim examiners, and Dr. Layden. And then the law changed. And the law says you get more than that. And so I went and I said, you know what? I want to get what I'm entitled to. And the judge said, no, you stipulated, but I stipulated based on the law that was existing at the time. Had I not stipulated and we disputed it and I got exactly what we ended up taking, there's no question I would have the right to get this additional discovery. So one of your key points today centers on Dr. Layden. Is that right? Dr. Layden and defendants, what they're calling medical reviews. Every one of those reviews are written by a nurse. But you had Dr. Layden's deposition, correct? I did, yes. So you don't need that again? I do not need Dr. Layden's testimony. And isn't he sort of the linchpin of the whole thing on which the medical reviews and everything springs from? He absolutely is. But you had his deposition on round one. Yes, I did. So why can't, why isn't that sufficient now as a basis, whether it is legally sufficient or not, why isn't that really the basis, one of the bases of your conflict claim? It is. The argument that I have... I'm having trouble understanding the additional discovery that you think you would get on round two that you couldn't have at least asked for in round one. Well, on round one there was a whole issue, I did not have that whole issue regarding the investigative reports and what claims were being made against UNUM. And so on round two I asked for it. Now, do I think that based upon Dr. Layden and the evidence that I've been able to obtain is sufficient? I absolutely do. I think it's sufficient to show that there was a substantial conflict of interest in this case. There were statutory violations in addition to what I referenced. All the treating doctors were supporting. They did not give her appropriate claim approved. And all this is in the statute. No, in looking at UNUM's doctors and decision makers and comparing it to the treating physicians, you know, her initial treating physicians, I think it was Dr. Sheridan and was it Bierman, neither of them said that she was disabled. So it wasn't, the determination of Dr. Layden wasn't that far different from her original treating physicians. Why is there a weight of the evidence? Why does the fact that Layden came out in that way provide evidence of a conflict given the treating physicians, the original treating physicians? The treating doctors do indicate that Ms. Passione is disabled. They say that she would be unable to sustain an eight-hour day. They say that she would need rest periods. And they certainly go through it and indicate that she would not be able to work, which would match the definition of disability under the plan terms. I don't think Dr. Sheridan said that. My recollection was that he had indicated that she wasn't disabled and that Dr. Bierman had said she could do moderate work. Yeah, Sheridan said no limitations and Bierman said moderate limitations. And then the subsequent medical records that she submitted were also equivocal. So at least one of them indicated she could do some work on a part-time basis. And if she can do some work on a part-time basis, she fits under disabled under the terms of that policy. And so when we look at the terms of the policy, because that's what we need to do, that's where the medical evidence ties in and shows that she'd be unable to sustain work. I guess what I'm saying is, was there overwhelming evidence of disability? I didn't see that in the record. In my opinion, yes. Based upon those MRI scans, they're showing severe advanced cervical spondylosis at C5-6. Osteophytic spurring, pressing up against the spinal cord at C5-6. Severe hypertrophy, left greater than right at the C5-6 level. A diagnosis with radiculopathy and degenerative disc disease, and that's at page 114 of the transcript. And that's from the orthopedic. Could I ask you about the policy, just to make sure I understand? Mm-hmm. So she kicks into the post-24 months. That's what we're talking about here. That is correct. And disability under that means the insured cannot perform each of the material duties of any gainful occupation. So if I'm hearing you right, you're saying because she has these gainful occupations. I believe it would have to generate 80% of her pre-disability earnings. That's my recollection. Great. You want to save the, you don't have much time left. Yes, I'll save it. You might want to save that.                     Okay. May it please the Court, Counsel. My name is Brendan Griffin, and I represent the defendant, Unum Provida, in this case. Ma'am, you're absolutely correct when you say and ask, is there overwhelming medical evidence that Mrs. Passeron was totally disabled? That's the question that this Court has to ask. And there isn't such overwhelming evidence. The standard of review is for abuse of discretion. No matter how you look at it, it's for abuse of discretion. Under this Court's case law, as well as the Supreme Court case law, Glenn and Abadi, a conflict of interest, even if proven, is just one factor that this Court takes into consideration when deciding whether or not the lower court, in this case the plant administrator, abused its discretion. What are the other factors? The other factors are common sense factors. Was the claim looked at from all sides? Was the claimant given an opportunity to appeal? Were medical records collected? I mean, the courts haven't set forth firm, solid factors, but have said, this is a case-by-case analysis. It's an abuse of discretion standard. You look at... Almost like the Earl Warren standard. We look at what happened, and we decide whether it was fair or not. Well, I think that's correct, Your Honor, looking at the circumstances of each case. Because remember, this abuse of discretion standard is not just applied in long-term disability cases. It's also applied in pension cases. It's applied in life insurance cases. Any time you have an employee welfare benefit plan where the benefits at issue are at stake and that plan confers discretion... What about the other side's argument that his client was fed to a doctor who was predisposed to ignore certain conditions that were known to exist, such as fibromyalgia? So that suggests they were trying to rig it by feeding it to a doctor who was going to say no. Well, first, there's no evidence that they were trying to rig it. Dr. Layden says that 90% of his practice is treating patients. He's a PM&R, basically a physiatrist. Two of the plaintiffs treating physicians are physiatrists themselves. Dr. Layden said he could remember doing maybe one or two or three IMEs for Unum in the past. So we don't have some sort of history of always picking Dr. Layden to do... Dr. Layden's on the shelf. You pull him off whenever you have a fibromyalgia case. There's no evidence of that whatsoever. He actually said that when we took his deposition, I think he said he had 50 or so patients that he was treating with fibromyalgia. Now, in all honesty, if you read his deposition, he's skeptical of the disease. He thinks it can be abused. He thinks it's hard to actually diagnose it, and he says that those trigger points, 11 out of 18, are very subjective. And if you look at this Court's authority, it's the Jordan case. This Court says the same thing. It's a diagnosis of exclusion. It's very subjective. That's all Dr. Layden was saying. He didn't say, I don't believe nobody anywhere, anyhow, can ever be disabled from fibromyalgia. But the fact of the matter is, plenty of people have fibromyalgia and are not totally disabled, never mind from a sedentary or light occupation, which is the standard that Unum used to decide that Do we know that from the record? Yes. The vocational reports. Lots of people with fibromyalgia can be fully employed and make money. Oh, from the record? Yeah. I don't know if there's anything in the administrative record that says that, but the case law and this Court's case law, I can't cite a case. I know that I've read it where the medical literature says the people, I mean, and there is case law. Just because you have a diagnosis of some sort of condition doesn't mean you are disabled. And a lot of doctors say that the worst thing you can do to someone who has fibromyalgia is tell them they can't do anything. Your opponent says Dr. Korzat's involvement is not worth anything. Well, my opponent cited to you page 387 out of the record, saying that that's a nurse's on that page of the record. So he signed that. And this is the doctor also who, when, and we take a step back, look at the context of this. My client pays Mrs. Passioni over $90,000 in benefits, even though Dr. Sheridan says the plaintiff submitted I do not feel that she is disabled. I have not recommended that she be off work. Right. That's during the regular own occupation period. My client pays her, even though her treating physician says that. And he wants to say that we're somehow conflicted and biased and abused our discretion. But Dr. Korzat, when the any occupation period comes and we say, okay, we need to reassess if she's disabled from any occupation, Dr. Korzat gets Dr. Sheridan's opinion, gets Dr. Beard's opinion, the treating physician's, and says, there's a conflict. He doesn't say, aha, we've got one physician, a treating physician, an orthopedic surgeon. Let's deny this claim. Dr. Korzat does what you're supposed to do. There's a difference of medical opinion. Let's pick an IME doctor. He picks an IME doctor who specializes in treating people with musculoskeletal arthritis type conditions, who has the same specialty as two of the plaintiffs' treating physicians. What is the standard? He said it's 80%. Was she evaluated against any occupation or was she evaluated against that alternative standard? Any gainful occupation. The way the standard works is any occupation, and I can't remember the language, but it has to be gainful. Any gainful occupation, which you're fitted for. If you are an orthopedic surgeon, you become disabled. But the 80% rule doesn't apply to that language. Is that right? That goes to the income. I can't remember if it's 80% or 60%. It's usually 60% unless it's in a high end. What that means is that it has to be any occupation, in this case, light or sedentary occupation, in which she could earn 60% of her predisability income. And that just means so if you have a doctor who's disabled, you don't say, but you can work at a McDonald's and you're not disabled. They want to make sure that there's some parity in the income. Does that answer your question? Yes. The other concern, two concerns that are related, and that is not looking at all the records. Passione's counsel says, number one, that the IME didn't have or look at all the records. And then we have a second incident that occurs when the patient comes in with additional information and says, here, take a look at this. The doctor says no. So the underlying premise is that you're not dealing with the full deck of cards. If you look in the record, the referral to the IME doctor was June 26, 2001. And I don't have the record site written down for that. But the point is that the plaintiff hasn't pointed to any medical record that was in the administrative record at the time of that referral that was not sent to the IME doctor. There are records that came in afterwards when the plaintiff appealed. And if you look at the plaintiff's opening brief at page 28 through 39, it's 11 pages where he lists the dates of medical treatments. All of those dates are after the referral to the IME doctor. So and the administrative record is base numbered with not just the records, the sites to the record on appeal to this court, but they're base numbered, unimprovident, so that if there were records in the administrative record that were not given to Dr. Layden, the plaintiff could have easily figured out what those were. But I haven't been able to find, and it's a little confusing because the records he cites are not records with the administrative records base numbers on them. So it's really hard to determine what those records are. But there are not, I have not been able to find any records that were not given to Dr. Layden that unimprovident had at the time it made the referral. Sure there are records that came in afterwards. The other thing that, let's just assume there are records that Dr. Layden didn't have, and that happens sometimes. Not all the records get copied for one reason or another. But he hasn't pointed to any record that would have made a difference. And I want to go back to this idea of there needs to be overwhelming medical evidence. Before you get there, can you respond to the second part of Judith Newton's questions about the... There is, the plaintiff submits a letter on appeal complaining that Dr. Layden didn't look at her medical records. I don't believe Dr. Layden was asked about that during his testimony. He said that the, so we don't have his, I don't think in his deposition, I don't recall him saying anything about admitting I didn't look at her medical records, I didn't look at what she gave me. That comes from the plaintiff and the plaintiff only. Well, I was... There was some other kind of post-examination evidence that was brought in at one point, correct? There was submitted in January of... Dr. Bodell, for example. Dr. Bodell. And because it was dated, they said that it was dated too late and it seemed like they didn't evaluate whether, notwithstanding the date on the records, the information was relevant to the time period. Well, the last benefit, we stopped paying her as of August 2001. And the uphold letter from the appeals specialist said, if you're going to submit additional medical evidence, make sure you submit it so that it covers the time in question. Because the way these policies work, if Mrs. Passione is not disabled as in August of 2001, then her coverage ends. She's no longer employed. Her coverage under the policy ends. So if she were to become disabled two or three or four months later, say a horrible accident happens to her and she becomes disabled, she's no longer covered under the policy. In a way, though, this kind of catches 22. So if I say you're not disabled as of such and such a date, even though there may be medical records after the fact that don't suggest necessarily a future disability, but that would relate back to your condition on or before the fixed date of disability, if you say those are irrelevant, then they go into a limbo lane where we just never know. Well, they're not saying that it's the date of the medical record. It's the information contained within that medical record. If it relates back, if it can show you had restrictions and limitations. And was that examined? Yes. Dr. Baudel's letter? Dr. Baudel's letter was accepted and examined to see if it related to, in effect, the prior alleged disability. My understanding is that there were a number of appeals that she submitted. And I know that those records were reviewed by doctors. You're talking about the very last appeal, and I can't remember if I think so, because it's after August 2001. I can't remember if that record was reviewed by It was a submission to Catherine Durrell, and it was apparently rejected. Right. And we don't know why. Well, I just don't know, Your Honor, looking right now, whether or not that was Do you have ER-297 handy? I do. Is that the Baudel letter? Yes. What's the date on it? It is dated January The date of the visit is January 11, 2002. Is that too late? But what about the information? Does it point to the period that you say we must be talking about? It uses the present tense, I think, is. It depends on what is means. This patient is seen today. So when I'm scanning through this, it relates to how she's presenting on that day. But I think you can read through this letter and say that it's also incorporating things the doctor has already said in his submissions to Unimproper. There's nothing new in here to the extent it's talking about things during the relevant time period. Those things are already covered by his medical records that are in the file. And I wanted to touch real quickly on the idea of the medical evidence. If we put aside the IME and we put aside the four in-house doctors, to combine they have five different specialties, who all said that Mrs. Passione is not totally disabled from a sedentary or a light occupation. If we look at some of the plaintiff's own providers, we've talked about Dr. Sheridan. There was a Dr. Howard who was a rheumatologist who was involved in the beginning who said I think she can work part-time, was going to give her six more months. She never went to go treat with him again, never went to go treat with Dr. Sheridan again. We have Dr. Singh who submitted a letter during appeal. He's a spine doctor, pain doctor. He writes a to whom it may concern letter. And he doesn't say she's totally disabled. He simply says she's got some problems, prolonged activity of bending and lifting, caused fatigue, and is contraindicated. So you have five in-house doctors employed by UNUM that participate in this process? Yes. And what is their function? Their function is to review the medical evidence and opine on whether or not what restrictions and limitations the medical evidence demonstrates the insured has. Do you keep statistics that show how often they decide in favor of and how often they decide against UNUM, the in-house doctors? I don't know. That evidence hasn't been established in this case, and I don't know. Thank you. Could you ‑‑ there's only 35 seconds, so could we make it a minute so we have a reasonable time to say something? Thank you. So counsel had indicated that one of the jobs of their independent examiner is to review medical records. Look at each one of their reports. It's written by a nurse practitioner, and they write, I agree. There's no indication they reviewed any medical records. There's nothing in this file that indicates they reviewed a document. Now, is there something automatically defective about a nurse practitioner? I mean, my understanding is they go through reasonably rigorous training, and the medical profession now relies on them across the board. You go to a doctor's office, and you run into nurse practitioners. I mean, these are not people who you can automatically discard because they're called a nurse, can you? No, you can't automatically ‑‑ They're trained to do precisely what they're told to do. Correct. They're not trained to assess restrictions and limitations. They are trained to assist with medical treatment. They certainly do prescribe medications. Social Security does not call them treating medical sources, but says that, yes, you've got to consider their opinion. We absolutely agree with that. But you've got to look. The medical doctors are saying she can't work. Now, we're looking at records from these doctors. When they said she could work part time, she worked part time. During a portion of this period, that's what she was doing. And then she couldn't do it anymore. And then her doctors are saying, yes, we agree. We think you wouldn't be able to do it. She's 100% disabled is what they're saying. Does Dr. Sheridan's opinion get on the scale in your view? I don't recall the date of Dr. Sheridan's opinion. I think that was an opinion that was early on while the claimant was trying to work and doing part time work. So in that respect, yes. She's doing it. She's trying. And she's just following through. I do see my ‑‑ almost there. I've got five seconds left, I think. But I just want to read from one of the nurse practitioner's reports, and that's signed by Dr. Keller. The claimant has provided a list of medications, which I have reviewed. There is no reason why medications could not be altered if she were experiencing adverse side effects. Other common side effects associated with medications with chronic long‑term use generally subside. They're saying, well, if she changes her treatment, then she wouldn't have these medications. That's not their job. I mean, the symptoms from these medications. I didn't understand that the way you just read it. The nurse practitioner acknowledges that my client is having side effects from the medication. Having side effects from medication. Doesn't she say, well, we can change the medication? The nurse practitioner, who reviews it, not a doctor, not a treating physician, the nurse practitioner says, well, she can change when she takes it. She should go to her doctor. I find nothing nefarious about that. You told us nurse practitioners prescribe medications, and they're simply talking about possible adverse effects. This is a nurse practitioner who's reviewing medical records allegedly to ascertain whether an individual is disabled or not. This is not a treating nurse practitioner. So if my client is following medical advice and taking medications as prescribed and is suffering side effects that would interfere with her ability to sustain work, well, then she's met the terms of that contract and would be entitled to benefits. They can't turn around and start changing her treatment on her. That's up to her doctors. Thank you. The case just argued of Passione v. Unam is submitted.
judges: Trott, McKeown, Ikuta